**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3658-20

GINA LOUISE BILOTTI,

    Plaintiff-Appellant,

v.

NEW JERSEY PROPERTY
INSPECTIONS, LLC, and
HOWARD ALTMAN,

    Defendants-Respondents,

and

ROBERT REED and NORIKO
REED,

    Defendants.

_____

Argued February 28, 2022 – Decided March 14, 2022

Before Judges Sabatino, Mayer, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0022-21.

Glen J. Vida argued the cause for appellant.

Jenna K. Clemente argued the cause for respondents (Hardin, Kundla, McKeon & Poletto, attorneys; Patrick J. McCormick and Jenna K. Clemente, on the brief).

PER CURIAM

This appeal concerns the enforceability of an arbitration provision within a home inspection contract. The provision, which appears in paragraph 9 of the signed contract, reads in pertinent part as follows:

> 9. **BINDING ARBITRATION PROVISION PLEASE READ CAREFULLY**.
>
> Any dispute, controversy, interpretation, or claim, including claims for, but not limited to, breach of contract, any form of negligence, fraud, or misrepresentation, and/or any violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 through § 56:8-20, or any other theory of liability arising out of, from, or related to this Pre-Inspection Agreement or arising out of, from, or related to the Inspection or Inspection Report shall be submitted to final and binding arbitration as conducted by Construction Dispute Resolution Services, LLC or Resolute Systems, Inc., utilizing their respective Rules and Procedures. A NJ Licensed Home Inspector shall be a member of the Arbitration Board. The decision of the Arbitrator shall be final and binding and judgment on the decision may be entered in any Court of competent jurisdiction. **NOTICE: YOU AND WE WOULD HAVE A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION**.

2

Despite having signed the contract with this mandatory arbitration clause, plaintiff sued the home inspector and his company in the Law Division, along with other defendants. In her lawsuit, plaintiff alleges the inspector had been negligent in inspecting a single-family house she bought at a closing several days after receiving his written post-inspection report. The complaint alleges the inspector overlooked numerous defects in the house, which plaintiff discovered after buying it and which cost her substantial funds to address.

The inspector and his company moved to dismiss the complaint against them and compel arbitration, in accordance with the contractual provision. In opposition, plaintiff argued she was not bound by the arbitration clause, contending its enforcement is both procedurally and substantively unconscionable.

After conducting an evidentiary hearing at which plaintiff and the home inspector each testified, Assignment Judge Thomas C. Miller issued a fourteen-page written decision on July 21, 2021, finding the arbitration provision was not unconscionable. The judge dismissed the claims against the inspector and his firm and granted their motion to compel arbitration.[1] Plaintiff appeals, arguing

---

[1] The claims against the sellers were unaffected.

A-3658-20

the judge's decision is erroneous. We affirm, substantially for the sound reasons detailed in Judge Miller's comprehensive opinion.

We need not repeat here at length the facts in the record, which are detailed more fully in the trial court's opinion. The following summary will suffice.

At the time of the home inspection, plaintiff Gina Bilotti was an executive living and working abroad in Belgium for a major international healthcare company. As part of her job, plaintiff supervised over 370 employees and managed annual budget of up to $85 million. Plaintiff has a joint master's degree in engineering management. She testified she is not well versed in real estate matters.

Plaintiff was under contract to buy a house in Somerset County for $999,999. As is typical, the contract was contingent on the buyer obtaining a home inspection. The deadline for completing the inspection was August 16, 2017. Plaintiff initially attempted to hire an inspector she had used when she purchased her former residence in New Jersey years earlier, but that inspector was not available.

Plaintiff's real estate agent recommended to her defendant Howard Altman, a licensed home inspector who owns and operates co-defendant New

Jersey Property Inspections, LLC. Plaintiff, who was then in Belgium, contacted Altman and made arrangements with him to inspect the house on August 4, 2017. The agreed upon price of the inspection was $750.

A central dispute between the parties at the fact-finding hearing was whether Altman sent plaintiff a copy of a written agreement in advance of the inspection. A consumer regulation, N.J.A.C. 13:40-15.15, requires the customer to receive a written copy of the inspection agreement "no later than one business day after the appointment for the home inspection is made[,]" and that it be signed before the inspection begins. N.J.A.C. 13:40-15.15(a).

Altman testified at the hearing that he emailed the agreement to plaintiff at her company email address on August 2, 2017, two days before the planned inspection. As proof of the transmission, the defense moved into evidence screenshots of Altman's email account, showing an email draft from him to plaintiff with the contract attached. However, Altman did not present a confirmation that plaintiff actually received his email. Conversely, plaintiff testified that she never received such an email at her work account. By the time the hearing took place in 2021, plaintiff had left her job and no longer had access to her former company's email account.

A-3658-20

In resolving this particular factual dispute, Judge Miller made these findings:

> With regards to the issue of whether Ms. Bilotti was provided a copy of the agreement on August 2, 2017 (two days prior to the inspection), the Court finds that it is likely that the agreement form was provided to her, even though she has not been able to locate it. The Court is not accusing Ms. Bilotti of an untruth when she so testifies. In fact, the Court believes that she testified truthfully as to her understanding. Instead that there is likely another explanation, whether that be a SPAM filter or her failure to keep all personal e-mails, or perhaps another explanation.
>
> The Court finds that Mr. Altman's testimony on the subject and Exhibit D-2 was compelling. Although the actual e-mail was not retrieved, the evidence that Mr. Altman provided certainly seems to confirm that he sent Ms. Bilotti an e-mail at her work e-mail on August 2, 2017, even though she has been unable to retrieve the actual e-mail.

The contract states in a handwritten entry that the scheduled start time of the home inspection was 10:30 a.m. According to plaintiff, she took an overnight flight from Belgium to Newark Airport, which landed at 12:30 p.m. She testified she arrived at the house between 1:45 and 2:00 p.m. and encountered Altman there, coming down from the attic. As described by plaintiff, Altman told her he had already finished his inspection and needed to leave quickly to go to another site.

6

Plaintiff contends she felt rushed into signing the agreement, which she only glanced at without her reading glasses (which were out in her car), and then she handed Altman a check. As plaintiff recalled, she "tried to look through it as best [as] [she] could." She did felt she "shouldn't hold up Mr. Altman up because [she] knew . . . in advance that he had another appointment . . . and felt like . . . he was done[.]" She admitted that Altman had not told her "she better sign the contract right now because I'm leaving here this instant." Plaintiff did not notice at the time the contract's arbitration language in bold underlined font, although upon looking at it afterwards she conceded "it was bolded enough for sure."

Plaintiff explained to the court that she had been worried that if she refused to sign the agreement, she would have had trouble finding a substitute since she "wasn't going to be in New Jersey long enough to be able to stay for another inspection." She worried she could have "risked losing the house" by not meeting the purchase contract deadline. However, she did not state that she tried to contact her real estate lawyer that day about possibly asking the seller to extend the deadline, or that anything prevented her from seeking such advice.

Altman testified that it was his usual practice to wait until he had the customer's signature on the agreement before conducting a full inspection. He

A-3658-20

stated that a house of this size would take two or three hours to inspect, and that, at most, he would only do minor "preliminary" tasks before the customer arrived, such as opening doors, checking the dishwasher, and starting the stove. He denied pressuring or rushing plaintiff to sign the agreement.

Altman testified that about thirty to forty percent of his customers tend to forget to bring a signed copy of the agreement to the inspection, and that his usual practice would be to provide another copy at the site and give the customer up to about twenty minutes to review it. When asked about what he would do if the customer refused to sign it, Altman testified that he would leave the property and not issue an inspection report. According to Altman, the contract language is a standard form used by 80-90% of the home inspectors in New Jersey.

Paragraph 20 of the parties' agreement states as follows:

> 20. By signing this Agreement, the undersigned client(s) agree that he/she/I/they have read, understand, and agree to all of the terms and conditions on all pages of this Agreement, including the provisions for arbitration, and limitations and exclusions, and agree to pay the fee shown according to the terms above. <u>Client acknowledges that Client has had ample time and opportunity to review this Agreement prior to signing and that Client has signed this Agreement prior to the performance of the home inspection</u>. Client further acknowledges that Client has been encouraged to attend the inspection and understands that Client will not receive the full benefit of the inspection if Client does not attend.

8

[(Emphasis added).]

In her testimony at the hearing, plaintiff did not address this acknowledgement, other than her general admission that she had only glanced at the agreement before signing it.

According to plaintiff, Altman told her before he left the house that it "looked pretty good" aside from "a few things [that] could be addressed" and would be detailed in his report. He did not return to the house later that day to complete any further tasks.

Altman thereafter issued a thirty-six-page written inspection report identifying a few problems with the house and recommending that a roofing company evaluate the roof tiles.

As we have noted, the report states Altman arrived at the house at 11:00 a.m., which would have been about two-and-half hours before plaintiff arrived. In her own testimony, plaintiff did not recall the scheduled time for the inspection. She did admit that she arranged her real estate agent to be present and "stand in for [her] because [she] knew [she] wasn't going to make it for the beginning of the inspection . . . [though] was still hoping [she] was going to make some of it."

Plaintiff subsequently closed on her purchase, but she did not move in for over a year. When she moved in, she discovered problems with the house that Altman had not identified in his report, particularly water damage and mold. She alleges she spent about $200,000 in repairing items that Altman had failed to spot.

In January 2021 plaintiff filed this lawsuit against Altman and his company, along with the co-defendant sellers, in the Law Division. With respect to Altman, the complaint alleges his inspection was negligent and breached their contract, that his report contained misrepresentations, and that his handling of this matter tortiously interfered with her rights as a home buyer and violated the Consumer Fraud Act, N.J.S.A. 56:8-1 to -227, and the implied covenant of good faith and fair dealing.

As we noted, Altman and his company moved to compel arbitration.[2] Judge Miller preliminarily denied the motion without prejudice, discerning that an evidentiary hearing was warranted to hear and consider the testimony of plaintiff and Altman. Both parties were ably represented by counsel at the

---

[2] Notably, defendants only moved to compel arbitration and did not seek to enforce the agreement's truncated one-year limitations period.

A-3658-20

hearing. They did not call plaintiff's real estate agent who was present during the inspection, or any other witnesses.

Judge Miller generally found plaintiff's testimony about the events of the day of the inspection to be "clearer and more reliable" than that of Altman, who seemed to be "confused or have limited recollection about this specific inspection." However, as we have already noted, with respect to the email dispute, the judge found Altman's testimony on that discrete point "compelling," and that the screenshots show it was "likely" the agreement had been sent to plaintiff in advance.

After weighing the testimony and the documentary evidence, Judge Miller concluded that plaintiff had not met her burden to prove the inspection contract's arbitration clause was either procedurally or substantively unconscionable. The judge was satisfied that the arbitration clause was presented in a fair manner, and was "clear and unambiguous." As the judge noted:

> [A]lthough Ms. Bilotti has complained that the agreement is in "small print" that would have required her to wear her reading glasses to read the document, there is a portion of the provision that is in bold font and thus should have been visible and/or attracted the attention of a reader.

The judge further concluded that the process that led to plaintiff signing the agreement was not procedurally unconscionable:

11

In this case, Ms. Bilotti, a person of above-average education, intelligence and business acumen and experience simply did not read the agreement. She admitted that she "glanced" at it only and when she did so she did not even notice the provision in issue which contained bold print font in order to attract a reader's attention. She admitted that she was distracted due to the myriad of tasks that she had to accomplish in order to purchase a new home while living overseas. She was also likely distracted by the hectic travel arrangements that enabled her to only reach the inspection in the nick of time so she could personally speak to Mr. Altman. While she demonstrated an uncommon attention to detail with regards to her conversation with Mr. Altman, she exhibited an alarming lack of attention to detail when it came to the business arrangement with Mr. Altman. While she states that she now finds the provision in issue to be offensive and something she would not have agreed to, she inexplicably did not take the time to read the agreement when it counted most. As indicated by defense counsel in his closing, "that is on her." Certainly Mr. Altman should not be made to suffer or not receive the "benefits" of his agreement as a result of Ms. Bilotti's inattention.

The judge then stated in summary:

In short, Ms. Bilotti's conduct does not warrant a finding of unconscionability. The facts of this case do not indicate age, literary or lack of sophistication by Ms. Bilotti. In fact, the opposite is true. Nor does the agreement contain hidden or complex contract terms or illicit unsavory or untoward bargaining tactics. Had Ms. Bilotti taken the time to do more than simply glance at the agreement, we may not be here. In the Court's view, the circumstances here do not indicate a finding of unconscionability.

On appeal, our scope of review of the trial judge's findings derived from the evidentiary hearing is limited. A trial court's factual findings generally are "binding on appeal when supported by adequate, substantial, credible evidence." Cumberland Farms, Inc. v. N.J. Dep't of Envtl. Prot., 447 N.J. Super. 423, 437-38 (App. Div. 2016) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)). This level of deference requires a reviewing court to accept the trial court's factual findings unless it is "convinced that [the findings] are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). That said, we also recognize that the legal underpinnings of a trial court's decision to enforce arbitration provisions can, at times, pose questions of law that are subject to de novo review by this court. Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 207 (2019).

Here, the trial court's findings have ample support in the record and are consistent with the governing law.

It is well established that under the preemptive force of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 to 16, as construed by the United States Supreme Court and the courts of this state, voluntary agreements to resolve disputes through arbitration in lieu of litigation are presumptively favored and

13

enforceable. See, e.g., AT&T Mobility, LLC v. Concepcion, 563 U.S. 33 (2011); Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 441 (2014); Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 131 (2001).

In connection with this analysis, courts must be assured "that the contracting parties know that in electing arbitration as an exclusive remedy, they are waiving their time-honored right to sue." Garfinkel, 168 N.J. at 132. The New Jersey Supreme Court has stressed that such waivers "must be clearly and unmistakably established" to both parties. Id. at 140 (internal citation omitted); see also Atalese, 219 N.J. at 443-44.

Case law recognizes that certain arbitration agreements may be deemed unenforceable if they are either procedurally or substantively unconscionable. Muhammad v. Cty. Bank of Rehoboth Beach, Del., 189 N.J. 1, 15 (2006); Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353-54 (1992). Procedural unconscionability "can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 564-65 (Ch. Div. 2002), accord Delta Funding Corp. v. Harris, 189 N.J. 28, 40

(2006). Substantive unconscionability, meanwhile, generally involves "harsh or unfair one-sided terms." Muhammad, 189 N.J. at 15 (citing Sitogum, 352 N.J. Super. at 564-66).

It is the party seeking invalidation of an arbitration provision's burden to demonstrate that the provision is unenforceable due to unconscionability. Delta Funding, 189 N.J. at 39. That determination is fact-sensitive and made on a case-by-case basis. Ibid.

The trial court was appropriately guided by these legal principles here. As plaintiff herself conceded in hindsight, the arbitration provision in the agreement is prominently displayed in bolded and underlined font. The language of the provision is in plain and straightforward words. Aside from the truncated one-year limitations period in paragraph 10 of the agreement—which Altman and his company are not seeking to enforce—the terms of paragraph 9 compelling arbitration are not manifestly one-sided or unfair. Plaintiff can pursue in arbitration the very same common law and statutory remedies she can obtain in the Law Division if she proves the merits of her claims.

The trial court's findings of a lack of procedural unconscionability are also supported by the record and well-reasoned. Although we realize the parties' testimony about the emails differed, we will not second-guess the judge's factual

A-3658-20

finding that it was most likely Altman did indeed send the form agreement to plaintiff in advance of the inspection, in accordance with N.J.A.C. 13:40-15.15. See Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 483-84 (1974) (reviewing courts shall adopt a trial court's factual determinations when "supported by adequate, substantial and credible evidence"). As the judge found, plaintiff had a reasonable opportunity to review the agreement ahead of time.

We are mindful that the second sentence of N.J.A.C. 13:40-15.15 calls for the written agreement to be signed before the inspection begins. We recognize that Altman admitted that he did begin working on the inspection when he arrived at or around 11:00 a.m. Although the parties disputed how much of the inspection was completed, it is undisputed that plaintiff arrived more than two hours after the 10:30 a.m. start time written on the contract and the 11:00 a.m. time that Altman arrived. Plaintiff anticipated that she would be arriving at the inspection late, and relied on her real estate agent to be present in her absence.

Under the circumstances, it would have been unreasonable to require an inspector to wait around for over two hours and do nothing, without getting a call from the customer explaining her delay and updating her expected time of arrival. It was not defendant's fault that the parties' time together at the house

was compressed. Plaintiff unilaterally selected an international flight that made it impossible for her to arrive at the house on time. In addition, in paragraph 20 of the agreement, plaintiff acknowledged that the agreement was timely executed. She did not call an attorney to try to postpone the house closing.

Although the inspector did start the inspection before the agreement he sent plaintiff was signed, his non-adherence to that portion of the regulation does not make the arbitration clause within the agreement per se unenforceable or unconscionable. The circumstances are distinguishable from those in Lucier v. Williams, 366 N.J. Super. 485 (App. Div. 2004), cited by plaintiff, in which we invalidated an exculpatory clause within a home inspection contract because the provision conflicted with the regulatory scheme. No exculpatory clause is sought to be enforced here, and these defendants are as exposed to liability as they would be in a Superior Court action.

To the extent we have not discussed them, all other arguments presented lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION